**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRADLEY LAND COMPANY, a California corporation,<br>Plaintiff,<br><br>v.<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation; and DOES 1 through 10, inclusive,<br>Defendants. | 2:25-cv-10605-DSF-JDE<br><br>Order GRANTING IN PART and DENYING IN PART Plaintiff's Motion for Summary Judgment and DENYING Defendant's Motion for Summary Judgment (Dkts. 22 & 24) |

Before the Court are the cross-motions for summary judgment of Plaintiff Bradley Land Company (Bradley), dkt. 24, and Defendant Travelers Property Casualty Company of America (Travelers), dkt. 22. The Court deems these matters appropriate for decision without oral rgument. See Fed. R. Civ. P. 78; Local Rule 7-15. Bradley's motion is GRANTED IN PART and DENIED IN PART, and Travelers' motion is DENIED.

## I. Background[1]

This is an insurance coverage dispute over whether Travelers has a duty to defend a personal injury action against its insured, Bradley.

[1] The Court relies on the facts, or the portions of the asserted undisputed facts, to which the parties agree. Where the parties disagree, the Court has noted for context what each party claims without adopting a position. To the

The question presented is whether the underlying action falls within the pollution exclusion under the insurance policy Travelers issued to Bradley.

## A. The Insurance Policy

Travelers issued Commercial General Liability Policy No. I-660-6796X936 TIL-22 to Bradley for the period May 18, 2022 through May 18, 2023, with a $2 million per-occurrence limit (the Policy). Dkt. 27-1 (Def.'s Statement of Genuine Disputes) ¶ 1 [Def. SGDs].[2] The Policy includes a Commercial General Liability Coverage Form, which provides, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

Dkt. 21-1 (Policy) at 15.[3] The Commercial General Liability Coverage Form further provides, in relevant part:

> This insurance does not apply to: . . .

---

extent certain facts are not mentioned, the Court has not relied on them in reaching its decision. The Court has independently considered the admissibility of the evidence and has not relied on facts that are irrelevant or are based on evidence that could not be presented in an admissible form at trial.

[2] Travelers' Statement of Genuine Disputes contains Travelers' positions with respect to Bradley's asserted undisputed facts. Dkt. 27-1.

[3] Except for the exhibit underlying Travelers' request for judicial notice, dkt. 23, the parties have stipulated to the authenticity of the exhibits they rely on. Dkt. 21.

**f. Pollution**

> **(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>
> > **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. . . .

Id. at 16 [Pollution Exclusion]. The policy defines "pollutants" to "mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Id. at 33.

## B. The Underlying Personal Injury Action

On November 22, 2024, Jorge Rodriguez (Claimant) and Kathy Rodriguez filed a form complaint in California Superior Court in the County of Santa Barbara, bringing causes of action for negligence, products liability, premises liability, and loss of consortium (the Underlying Action). Dkt. 26-1 (Pl.'s Statement of Genuine Disputes) ¶ 3 [Pl. SGDs][4]; Dkt. 21-2 (Rodriguez Compl.).[5]

The Rodriguez complaint alleges that Claimant was a "laborer," who "had been working on a job site . . . between approximately November 30, 2022 and March 3, 2023," and that during that period, Claimant "was exposed to various fumes of gases from chemicals store [sic] at the site . . . ." Rodriguez Compl. at 5, 6. According to the Rodriguez complaint, Claimant "suffered a cardiac arrest and collapsed shortly after arriving home on March 3, 2023." Id. "It was determined that [Claimant] had suffered from exposure to Hydrogen Sulfide gas

---

[4] Bradley's Statement of Genuine Disputes contains Bradley's positions with respect to Travelers' asserted undisputed facts. Dkt. 26-1.

[5] The case has the caption Rodriguez v. Bradley Land Co., et al., No. 24CV06679. Pl. SGDs ¶ 3.

(H2S [sic]), which resulted in [Claimant's] cardiac arrest, as well as other physical, mental, psychological and/or emotional injuries." Id.[6] It is undisputed that Bradley owned the job site at which Claimant alleges he was working. Pl. SGDs ¶ 5. The Rodriguez complaint further alleges that the defendants in that action, including Bradley, "are responsible for [Claimant's] injuries and damages due to, but not limited to, the following: Failure to safely operate the gas line and/or gas valve and/or storage tanks and/or wells; failure to properly design and/or maintain said gas line and/or gas valve and/or storage tanks and/or wells; failure to provide proper and/or adequate training and/or instructions for its employees employed by said [d]efendants; and/or failure to provide and/or display adequate warning regarding the dangers of the subject area of operation and the unsafe conditions that existed thereon." Rodriguez Compl. at 5, 6.

### C. Communications Between the Parties

On April 1, 2025, Bradley tendered the Underlying Action to Travelers for defense under the Policy. Pl. SGDs ¶ 8. In the letter tendering the Underlying Action, Bradley's counsel summarized the allegations in the Rodriguez complaint, mentioned that the complaint did not name Claimant's employer, and suggested Claimant's employer "may [have been] the oil and gas operator described [later in the letter], one of its contractors, or a surface tenant engaged in farming operations." Dkt. 21-3 (April 1, 2025 letter from Bradley to Travelers) at 1-2.

On April 2, 2025, a Travelers representative sent an email to Bradley's counsel, stating, "I would like to clarify some details regarding the location of the H2S [sic] (hydrogen sulfide gas). The petition is unclear, as it simply states fumes of gases from chemicals

---

[6] Travelers requests that the Court take judicial notice of a printout from the U.S. Department of Labor's Occupational Safety and Health Administration website. Dkt. 23. Bradley does not oppose. The Court grants Travelers' request, but the Court finds the website unnecessary for the resolution of the parties' motions.

stored at the site. Do you have any knowledge of where these chemicals were stored?" Dkt. 21-4 (April 2-21, 2025 emails between Travelers and Bradley) at 8. On the same day, an attorney representing Bradley responded, "A former tenant, who was active at that time, was engaged in petroleum exploration on Bradley's property. We assume the H2S [sic] is a byproduct of those activities, but we do not know for certain." Id. at 7.

On the next day, another attorney representing Bradley responded:

> Regarding the location of the H2S [sic] (hydrogen sulfide), neither we nor our client, your insured, have knowledge of where chemicals were stored on the property at the time. . . . [T]he entities that would have such knowledge would be the operators of the premises under the oil and gas leases during the period referenced in the complaint, which according to our records, would have been Team Maria Joaquin LLC and Maria Joaquin Basin LLC. However, they no longer operate on the property. The two entities produced, removed and sold oil from the property during that time, and we are equally unaware of the specifics on how hydrogen sulfide was stored or used by the operators, or whether it was simply a byproduct of the production process.

Id. at 5-6.

On April 21, 2025, Travelers sent Bradley's counsel a letter, stating that it had determined it had "no obligation to defend and/or indemnify Bradley . . . ." Dkt. 21-5 (April 21, 2025 letter from Travelers to Bradley) at 1. The letter further stated:

> You have advised that you do not know the source of the hydrogen sulfide gas, but it is presumed that the gas was a byproduct of oil & gas exploration activities. According to your records, the entities operating on the property at the time of the alleged incident were Team Maria Joaquin LLC

> and Maria Joaquin Basin LLC. These two entities produced, removed, and sold oil from the property during the time period in question but have no specific knowledge of their operations or activities.

Id. at 2. After quoting the Pollution Exclusion from the Policy, the letter stated:

> The plaintiff allegedly suffered injuries and/or damages as a result of exposure to fumes and gases, including but not limited to, hydrogen sulfide gas that was stored at a site owned, operated, controlled, managed and/or maintained by Bradley. The above cited Pollution Exclusion specifically precludes coverage for "bodily injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at or from any premises, site or location which is or was at any time owned by Bradley. As such, Travelers declines any obligation to defend and/or indemnify Bradley for the claims asserted in the Lawsuit.

Id. at 3.

Following further communications between the parties, Bradley filed suit against Travelers in California Superior Court, which Travelers removed to this Court. Dkt. 1. Bradley's first amended complaint alleges breach of contract and seeks declaratory relief. Dkt. 14. The parties now cross-move for summary judgment on the same issue: whether the Pollution Exclusion precludes Travelers' duty to defend Bradley in the Underlying Action.

## II. Legal Standard

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); accord Fed. R. Civ. P.

56(a). "[S]ubstantive law will identify which facts are material," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the parties file cross-motions for summary judgment, courts have a "duty to review each cross-motion separately" and "must review the evidence submitted in support of each cross-motion." Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001). Courts, however, need not "organize [their] discussion of the cross-motions into separate sections" where "briefing on the motions was combined in response to an agreed upon motion by the parties and the central legal issue was the same." Tulalip Tribes of Wash. v. Washington, 783 F.3d 1151, 1156 (9th Cir. 2015).

## III. Discussion

The parties agree that California law applies. Dkt. 22-1 (Def. Mot.) at 11; Dkt. 24-1 (Pl. Mot.) at 7. "Under California law, a general liability insurer 'has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement.'" Street Surfing, LLC v. Great Am. E & S Ins. Co., 776 F.3d 603, 607 (9th Cir. 2014) (quoting Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 19 (1993)). "The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded . . . or until it has been shown that there is *no* potential for coverage[.]" Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 295 (1993) (in bank). "The duty to defend is . . . 'broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.'" Street Surfing, 776 F.3d at 607 (quoting Montrose, 6 Cal. 4th at 295).

"When determining whether a particular policy provides a potential for coverage and a duty to defend, [courts] are guided by the principle that interpretation of an insurance policy is a question of

law." Waller, 11 Cal. 4th at 18. "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081 (1993) (in bank). Coverage is "interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 648 (2003) (citation modified).

"To prevail, 'the insured need only show that the underlying claim *may* fall within policy coverage,' whereas 'the insurer must prove it *cannot*.'" Street Surfing, 776 F.3d at 607 (quoting Montrose, 6 Cal. 4th at 300). Consequently, "[i]f coverage depends on an unresolved dispute over a *factual* question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend." N. Cntys. Eng'g, Inc. v. State Farm Gen. Ins. Co., 224 Cal. App. 4th 902, 919 (2014). "Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales." Montrose, 6 Cal. 4th at 300. But "a potential for coverage cannot be based on an unresolved legal dispute concerning policy interpretation which is ultimately resolved in favor of the insurer." Lebas Fashion Imps. of USA, Inc. v. ITT Hartford Ins. Grp., 50 Cal. App. 4th 548, 556 (1996).

"Facts extrinsic to the complaint . . . give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." Montrose, 6 Cal. 4th at 295. But in order for extrinsic evidence to *defeat* a duty to defend, "such evidence [must] present[] undisputed facts which conclusively eliminate a potential for liability." Id. at 298-99 (citation omitted).

The parties do not dispute that the Underlying Action includes claims for "damages because of 'bodily injury'" within the meaning of the Policy's provision for Travelers' duty to defend. Policy at 15. It is therefore undisputed that the Underlying Action "is within the basic scope of coverage." MacKinnon, 31 Cal. 4th at 648. Instead, the parties

contest only the applicability of the Pollution Exclusion, one of the exceptions to Travelers' duty to defend. Def. Mot. at 12; Pl. Mot. at 2. "The burden is . . . on the insurer to establish that the claim is specifically excluded." MacKinnon, 31 Cal. 4th at 648.

### A. Pollution Exclusions Under California Law

The parties agree that MacKinnon v. Truck Insurance Exchange governs pollution exclusions in California. Def. Mot. at 14; Dkt. 26 (Pl. Opp'n) at 14. There, the California Supreme Court examined the meaning of a pollution exclusion substantially similar to the one at issue. MacKinnon, 31 Cal. 4th at 639.[7] The underlying personal injury complaint alleged that the landlord insured's negligent use of pesticides to eradicate yellow jackets in its apartment building resulted in the death of a tenant. Id. at 639-40. First, the court found that the broad language in the policy concerning the duty to defend "establishe[d] a reasonable expectation that the insured will have coverage for ordinary acts of negligence resulting in bodily injury. . . . Coverage will therefore be found unless the pollution exclusion conspicuously, plainly and clearly apprises the insured that certain acts of ordinary negligence . . . will not be covered." Id. at 649.[8]

The court then analyzed the historical background of the pollution exclusion, finding that the "pollution exclusion was adopted to

---

[7] The pollution exclusion in MacKinnon states, "We do not cover Bodily Injury or Property Damage (2) Resulting from the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants: (a) at or from the insured location." MacKinnon, 31 Cal. 4th at 639. And the "terms 'Pollution or Pollutants' are defined, in the definitions section at the beginning of the policy, as 'mean[ing] any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste materials.'" Id.

[8] The policy "obligated the insurer to pay 'all sums for which [the insured] become[s] legally obligated to pay as damages caused by bodily injury, property damage or personal injury.'" MacKinnon, 31 Cal. 4th at 639 (alteration in original).

address the enormous potential liability resulting from anti-pollution laws enacted between 1966 and 1980." Id. at 653. The court explained that "the definitional phrase 'any irritant or contaminant' [was] too broad to meaningfully define 'pollutant,'" and would "lead[] to absurd results and ignore[] the familiar connotations of the words used in the exclusion." Id. at 652. Instead, "discharge, dispersal, release or escape," used "*in conjunction with* 'pollutant,' commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted." Id. at 653. The court therefore held that "the scope of the pollution exclusion" should be limited "to injuries arising from events commonly thought of as pollution, i.e., environmental pollution[.]" Id.

Applying this standard, the court found that, "[w]hile pesticides may be pollutants under some circumstances, it is unlikely that a reasonable policyholder would think of the act of spraying pesticides under these circumstances as an act of pollution." Id. at 654. The court explained that the "common understanding of the word 'pollute' indicates that it is something creating impurity, something objectionable and unwanted," and that the "normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word 'pollute.'" Id. (citation omitted). Consequently, the court held that the pollution exclusion did not apply. Id. at 656.

### B. Whether the Underlying Action Falls Under the Pollution Exclusion

Both parties rely on the California Supreme Court's interpretation of the pollution exclusion under MacKinnon, and neither party argues that the Pollution Exclusion should be interpreted differently. The Court agrees. The definition of "pollutant" in the Pollution Exclusion is almost identical to the one in MacKinnon. Compare Policy at 33 with MacKinnon, 31 Cal. 4th at 639. And, similar to MacKinnon, the Pollution Exclusion uses "pollutant" in conjunction with the terms "discharge, dispersal, seepage, migration, release or escape." Id. at 16. Consequently, the Court finds that the

scope of the Pollution Exclusion is similarly limited "to injuries arising from events commonly thought of as pollution, i.e., environmental pollution[.]" MacKinnon, 31 Cal. 4th at 653.

The question presented in this case is whether the Pollution Exclusion "plainly and clearly excludes" the incident alleged in the Rodriguez complaint: in other words, whether the allegations in the Rodriguez complaint and the permissible extrinsic evidence show that the alleged injury "ar[ose] from events commonly thought of as pollution, i.e., environmental pollution." MacKinnon, 31 Cal. 4th at 653, 655-56. Under MacKinnon, whether an event is commonly thought of as pollution depends "upon the type of pollutant and how it is released into the environment." Am. Cas. Co. of Reading, PA v. Miller, 159 Cal. App. 4th 501, 516 (2008).

The relevant allegations in the Rodriguez complaint are:

- Claimant "was exposed to various fumes of gases from chemicals store [sic] at the site . . . ." Rodriguez Compl. at 5, 6.
- "It was determined that [Claimant] had suffered from exposure to Hydrogen Sulfide gas (H2S [sic]), which resulted in [Claimant's] cardiac arrest, as well as other physical, mental, psychological and/or emotional injuries." Id.
- The defendants, including Bradley, "are responsible for [Claimant's] injuries and damages due to, but not limited to, the following: Failure to safely operate the gas line and/or gas valve and/or storage tanks and/or wells; failure to properly design and/or maintain said gas line and/or gas valve and/or storage tanks and/or wells; failure to provide proper and/or adequate training and/or instructions for its employees employed by said Defendants; and/or failure to provide and/or display adequate warning regarding the dangers of the subject area of operation and the unsafe conditions that existed thereon." Id.

Bradley also made the following representations to Travelers before Travelers notified Bradley that it had no duty to defend:

- "A former tenant, who was active at that time, was engaged in petroleum exploration on Bradley's property. We assume the H2S [sic] is a byproduct of those activities, but we do not know for certain." Dkt. 21-4 at 7.

- "Regarding the location of the H2S [sic] (hydrogen sulfide), neither we nor our client, your insured, have knowledge of where chemicals were stored on the property at the time. . . . [T]he entities that would have such knowledge would be the operators of the premises under the oil and gas leases during the period referenced in the complaint, which according to our records, would have been Team Maria Joaquin LLC and Maria Joaquin Basin LLC. However, they no longer operate on the property. The two entities produced, removed and sold oil from the property during that time, and we are equally unaware of the specifics on how hydrogen sulfide was stored or used by the operators, or whether it was simply a byproduct of the production process." Id. at 5-6.

Subsequent communications between the parties did not include additional factual details regarding Claimant's exposure to hydrogen sulfide. See Pl. SGDs ¶¶ 12-16; Def. SGDs ¶¶ 15-20.

The Rodriguez complaint allegations and Bradley's representations do not answer the question of "how [the hydrogen sulfide] was released into the environment." Am. Cas. Co. of Reading, 159 Cal. App. 4th at 516. The Rodriguez complaint alleges only, in the passive voice, that Claimant "was exposed to various fumes of gases from chemicals store [sic] at the site owned" by Bradley. Rodriguez Compl. at 5, 6. Subsequent communications from Bradley indicate that it did not know how the hydrogen sulfide was stored or used, and they do not reveal what caused Claimant's exposure to the gas and how Claimant was exposed. Dkt. 21-4 at 5-7. As a result, factual questions remain over whether there was "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape" within the

meaning of the Pollution Exclusion and MacKinnon. Policy at 16.[9] Because "coverage depends on an unresolved dispute over a *factual* question, the very existence of that dispute . . . establish[es] a possibility of coverage and thus [Travelers'] duty to defend." N. Cntys. Eng'g, 224 Cal. App. 4th at 919; see also Cambria Co. LLC v. Philadelphia Indem. Ins. Co., No. 2:24-cv-01913-MEMF-MBK, 2026 WL 776300, at *11 (C.D. Cal. Mar. 17, 2026) (finding that the insurer had not "created enough of a record to conclude that the inquiry would demonstrate that the [pollution exclusion] bar[red] all claims"); Wesco Ins. Co. v. Brad Ingram Constr., No. 22-16584, 2024 WL 243344, at *2 (9th Cir. Jan. 23, 2024) (finding because "the pollution exclusion d[id] not apply unambiguously to the [alleged] injuries, there existed a potential for coverage under the insurance policy, and [the insurer] had a duty to defend the litigation").

Travelers contends that no factual questions remain. First, Travelers argues, "Hydrogen sulfide gas falls plainly within the Policy definition of a 'pollutant' as a toxic gas, triggering application of the exclusion to the claim." Def. Mot. at 12. Travelers cites cases from various jurisdictions that "have concluded that such gases constitute pollutants," and asserts that it "cannot be reasonably disputed that hydrogen sulfide gas 'is highly toxic.'" Id. at 13. But the MacKinnon court rejected analyzing a chemical in isolation to determine whether an alleged event constitutes environmental pollution. As the court explained, "Virtually any substance can act under the proper circumstances as an 'irritant or contaminant.'" MacKinnon, 31 Cal. 4th at 650. Instead, the court read "discharge, dispersal, release or escape" "*in conjunction with* 'pollutant,'" to find that, together, they "refer to the sort of conventional environmental pollution at which the pollution

---

[9] These factual questions concern events underlying the Underlying Action. The parties have stipulated the authenticity of the Rodriguez complaint and the communications between Bradley and Travelers. Dkt. 21. Neither party's statement of genuine disputes contests the contents of the Rodriguez complaint and the parties' communications, even if they dispute the factual representations made in those exhibits.

exclusion was primarily targeted." Id. at 653. The fact that hydrogen sulfide is toxic by itself does not mean that Claimant's exposure to it constitutes environmental pollution under the Pollution Exclusion. Cf. Wesco, 2024 WL 243344, at *1 ("Under MacKinnon, neither the substance nor the mechanism of exposure is dispositive; they are to be considered 'in conjunction' with one another.").

Travelers asserts that "the Underlying Action is premised upon the Claimant's exposure to the gas released and dispersed at Bradley Land's property." Def. Mot. at 13-14. Throughout its briefing, Travelers characterizes Claimant's exposure to hydrogen sulfide as caused by the "release," "dispersal," or "escape" of hydrogen sulfide. E.g., id. at 6, 12-16. The MacKinnon court explained that the terms "release" and "escape" "connote some sort of freedom from containment," and found that "it would be unusual to speak of the normal, intentional application of pesticides as a 'release' or 'escape' of pesticides." MacKinnon, 31 Cal. 4th at 651. And "the word 'dispersal,' when in conjunction with 'pollutant,' is commonly used to describe the spreading of pollution widely enough to cause its dissipation or dilution." Id. Here, though Travelers supplies the words "release," "escape," and "dispersal," the Rodriguez complaint does not contain enough factual detail to indicate that any of those terms, in the context of environmental pollution, are applicable.[10]

According to Travelers, the Rodriguez complaint "ties the injury directly to exposure to gas released from the 'gas line, gas valve,

[10] In its opposition, Travelers also asserts that "seepage" and "migration" are "terms describing the movement of contaminants from an industrial source into the surrounding environment," and that "[t]hat is exactly what is alleged in the Underlying Action[.]" Dkt. 27 (Def. Opp'n) at 12. Even assuming Travelers' definitions of "seepage" and "migration" are correct, the Rodriguez complaint neither identifies the source of the hydrogen sulfide nor describes how the gas moved from that source to Claimant. The record therefore does not establish that Claimant's exposure to hydrogen sulfide resulted from "seepage" or "migration" constituting environmental pollution within the meaning of MacKinnon.

storage tanks, or wells' at the Property." Dkt. 27 (Def. Opp'n) at 10. Tellingly, though Travelers uses quotation marks, it does not cite any page in the Rodriguez complaint as the source of the quotation. No such allegation exists. Travelers appears to have misquoted the complaint's allegation that Claimant's injuries were caused by the "[f]ailure to safely operate the gas line and/or gas valve and/or storage tanks and/or wells[.]" Rodriguez Compl. at 5, 6.[11] The clause lists potential alternative sources for Claimant's injuries and provides little factual detail explaining how his injuries were caused. Moreover, that clause itself is just one alternative cause among many, with others including "failure to provide proper and/or adequate training and/or instructions for its employees employed by said Defendants; *and/or* failure to provide and/or display adequate warning regarding the dangers of the subject area of operation and the unsafe conditions that existed thereon." Id. (emphasis added). The disjunctive nature of and lack of factual detail in these allegations make it equally consistent that it was the alleged defective warning that caused Claimant to open a container storing hydrogen sulfide, causing his injuries.[12] "While [hydrogen sulfide] may be [a] pollutant[] under some circumstances, it is unlikely a reasonable policyholder would think of" the opening of a container storing hydrogen sulfide because of a warning defect "as an act of pollution." MacKinnon, 31 Cal. 4th at 654.[13]

---

[11] For the products liability claim, the Rodriguez complaint states that Claimant "was injured by the following product: Gas line/Valve/gas tank/gas well/gas fumes/gas/chemicals unknown." Rodriguez Compl. at 7. But this allegation does not resolve "how [hydrogen sulfide] [wa]s released into the environment." Am. Cas. Co. of Reading, 159 Cal. App. 4th at 516.

[12] The Court provides this example only to illustrate the bareness of the Rodriguez complaint allegations and takes no position on the merits of any of Claimant's theories of liability.

[13] Travelers argues that "[e]very single theory of liability alleged in the Underlying Action . . . is predicated on the injuries the Claimant purportedly sustained after he was exposed to hydrogen sulfide gas or 'various fumes of gases from chemicals' at the Property, triggering application of the Pollution

All the California cases Travelers cites, where the court found that the pollution exclusion precluded the duty to defend, involved underlying actions that included specific factual allegations of events "commonly thought of as pollution, i.e., environmental pollution." MacKinnon, 31 Cal. 4th at 653; see, e.g., Garamendi v. Golden Eagle Ins. Co., 127 Cal. App. 4th 480, 483, 486 (2005) (finding allegations that "silica-containing dust" created and dispersed during "sandblasting" constituted "environmental pollution" under MacKinnon); The Villa Los Alamos Homeowners Ass'n v. State Farm Gen. Ins. Co., 198 Cal. App. 4th 522, 536-37 (2011) (finding "the scraping and removal of acoustical 'popcorn' ceilings containing asbestos" constituted "'release' of asbestos into the air" within the meaning of the pollution exclusion); Am. Cas. Co. of Reading, PA v. Miller, 159 Cal. App. 4th 501, 515 (2008) (finding that the defendant had "pled guilty to negligently discharging pollutants into a public sewer system," which was "an act of environmental pollution" that fell within the pollution exclusion). That level of specificity is absent from the allegations here, and Bradley's representations do not conclusively show that pollution, as defined by the Pollution Exclusion and in MacKinnon, occurred.

Travelers points to the "arising out of" language in the Pollution Exclusion and argues that California courts construe such language broadly. Def. Mot. at 14-15; Def. Opp'n at 10-11. But none of the cases Travelers cites in support concern a pollution exclusion.[14] And even if the phrase "arising out of" should be construed broadly, that does not resolve the factual question of how Claimant was exposed to hydrogen

---

Exclusion." Def. Mot. at 18. But Travelers' argument assumes that the nature of the gas, by itself, is sufficient for the Pollution Exclusion to apply. As discussed above, the Court in MacKinnon rejected that premise.

[14] Indeed, in its analysis of the history of the pollution exclusion, the California Supreme Court noted that a narrower 1970 standard-form pollution exclusion excluded bodily injury "arising out of the discharge, dispersal, release or escape" of pollutants. MacKinnon, 31 Cal. 4th at 643-44.

sulfide such that the exposure constitutes pollution within the meaning of the Pollution Exclusion and MacKinnon.

Travelers also argues that the MacKinnon court "drew a distinction between industrial or environmental releases on the one hand and ordinary consumer or household exposures on the other," and that the "present matter fits well within the industrial side of the line drawn by MacKinnon." Def. Opp'n at 13-14. Travelers quotes the following example from MacKinnon:

> While a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as "pollution." It seems far more reasonable that a policyholder would understand it as being limited to irritants and contaminants *commonly thought of as pollution* and not as applying to every possible irritant or contaminant imaginable.

MacKinnon, 31 Cal. 4th at 652-53 (quoting Reg'l Bank of Colo. V. St. Paul Fire & Marine Ins. Co., 35 F.3d 494, 498 (10th Cir. 1994)). But the court merely quoted the Tenth Circuit case as an example of "the common connotative meaning of" the term "pollutant." Id. The court itself did not apply the distinction between industrial and residential settings and did not hold that the distinction is dispositive on the issue of whether an event is "commonly thought of as pollution, i.e. environmental pollution[.]" Id. at 653.

Indeed, in one of the cases Travelers cites, the court found the pollution exclusion applied in a residential setting. See The Villa Los Alamos, 198 Cal. App. 4th at 527, 539 (finding that "the disturbing of asbestos during the scraping of acoustical 'popcorn' ceilings in a three-story, 18–unit residential building, in which asbestos fibers were released into the air . . . constitutes environmental pollution," and that the "residential/industrial distinction has little significance here").

Conversely, courts have found pollution exclusions not to apply in industrial settings. See, e.g., Am. Zurich Ins. Co. v. James N. Gray Co., No. SACV 13-1966 AG (JPRx), 2014 WL 11430928, at *1, 5 (C.D. Cal. July 25, 2014) (finding that dust and silica released into the air from demolition and construction work at a Boeing job site, which allegedly injured workers at the site, did not constitute environmental pollution under the pollution exclusion). Consequently, that Claimant's exposure to hydrogen sulfide took place in an industrial setting does not establish that such exposure constitutes pollution under the Pollution Exclusion and MacKinnon.

The Court concludes that Bradley has satisfied its burden to show "the existence of a *potential for coverage*"; conversely, Travelers has failed to "establish *the absence of any such potential*." Montrose, 6 Cal. 4th at 300. Consequently, Travelers owes Bradley a duty to defend Bradley in the Underlying Action. When Travelers "decline[d]" to defend Bradley on April 21, 2025, it breached that duty. Dkt. 21-5 at 3.

### C. Reimbursement

Bradley argues that because "Travelers breached its duty to defend," it "is obligated to reimburse Bradley for all reasonable and necessary attorney fees and costs incurred in defending the Rodriguez Action from the date of tender through the final termination of that action at defense counsel's full market rates." Pl. Mot. at 23. Bradley also contends that it is entitled to prejudgment interest. Id. at 23-24. Travelers asserts that, if the Court finds breach—which it has—then "Bradley Land would still not be entitled to summary judgment on the amount of its claimed damages" because "fact-intensive issues," such as fees and costs, and their reasonableness and necessity, "cannot be resolved on the present record and would require discovery and additional briefing." Def. Opp'n at 18.

"In the general case, . . . the insured . . . must carry the burden of proof on the existence, amount, and reasonableness and necessity of . . . expenses as defense costs, and it must do so by the preponderance of the evidence." Aerojet-Gen. Corp. v. Transp. Indem. Co., 17 Cal. 4th 38,

64 (1997). "[I]n the exceptional case, wherein the insurer has breached its duty to defend, . . . the insured . . . must carry the burden of proof on the existence and amount of the . . . expenses, which are then presumed to be reasonable and necessary as defense costs," and the insurer "must carry the burden of proof that they are in fact unreasonable or unnecessary." Id.

The present record is devoid of facts regarding any of those elements. Summary judgment therefore cannot be granted with respect to the amount of reimbursement.

Bradley also asserts that, as "a breaching insurer, Traveler forfeits all rights under California Civil Code section 2860 . . . , including rate limitations." Pl. Mot. at 23. As a result, Bradley contends that Travelers is "obligated to reimburse Bradley . . . at defense counsel's actual market rates." Id. at 24. Travelers responds that Bradley's argument "depend[s] on a predicate finding that Travelers breached its duty to defend." Def. Opp'n at 18. But the Court has made that predicate finding, and Travelers does not otherwise argue that it still retains rights under section 2860 in the event of its breach.

"Breach of duty to defend . . . results in the insurer's forfeiture of the right to control defense of the action or settlement, including the ability to take advantage of the protections and limitations set forth in section 2860." Intergulf Dev. LLC v. Superior Court, 183 Cal. App. 4th 16, 20 (2010) (citing Atmel Corp v. St. Paul Fire & Marine, 426 F. Supp. 2d 1039, 1047 (N.D. Cal. 2005)). Section 2860(c) provides, in relevant part:

> The insurer's obligation to pay fees to the independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended.

Cal. Civ. Code § 2860(c). But "to take advantage of the provisions of § 2860, an insurer must meet its duty to defend and accept tender of the insured's defense, subject to a reservation of rights." Atmel, 426 F. Supp. 2d at 1047 (citation modified). Because Travelers breached its duty to defend, Bradley's "damages are not limited by California Civil Code § 2860." Id.

It does not follow, however, that Travelers is "obligated to reimburse Bradley . . . at defense counsel's *actual market rates*." Id. at 24 (emphasis added). For example, in State v. Pacific Indemnity Company, the California Court of Appeal rejected the State's argument that the breaching insurer should pay the market rate for the work done by the attorney general's office, even though the trial court had found that the insurer had forfeited the protections of section 2860. State v. Pac. Indem. Co., 63 Cal. App. 4th 1535, 1544, 1552 (1998). Instead, the court held that the State was limited to contract damages, which were below market rate. Id. at 1552. As stated above, the record contains no evidence establishing contract damages, namely, the amount Travelers must reimburse Bradley for its defense costs. Consequently, Bradley's request for costs at actual market rates is unsupported.

Finally, Bradley contends that "California Civil Code section 3287(a) provides that a party is entitled to prejudgment interest on damages that are certain or capable of being made certain by calculation." Pl. Mot. at 24. Because the record contains no evidence regarding the amount of damages, much less "damages certain," or the dates on which "the right to recover" vested, the Court cannot determine Bradley's entitlement to prejudgment interest. Cal. Civ. Code § 3287(a).

## IV. Conclusion

For the foregoing reasons, Travelers' motion is DENIED, and Bradley's motion is GRANTED IN PART. Travelers owes Bradley a duty to defend in the Rodriguez action. Travelers breached that duty by refusing to defend Bradley. Travelers must reimburse Bradley for

the reasonable and necessary defense fees and costs incurred and to be incurred in defending the Rodriguez action, and California Civil Code § 2860 does not limit Travelers' obligation.

Bradley's motion is DENIED without prejudice to the extent it seeks adjudication of the amount Travelers must reimburse and the prejudgment interest Travelers owes.

IT IS SO ORDERED.

Date: August 28, 2026

Dale S. Fischer
United States District Judge